UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| MARK NOTTAGE, | ) | |
|---|---|---|
| | ) | Case No. 3:18-cv-516 |
| *Nottage*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| SEVIER COUNTY, TENNESSEE and RONALD COLEMAN, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Before the Court is Defendants Sevier County, Tennessee and Ronald Coleman's (collectively, "Defendants") motion for summary judgment (Doc. 52). For the following reasons, the Court will **GRANT** Defendants' motion.

### I. DEFENDANT SEVIER COUNTY, TENNESSEE

As an initial matter, Nottage has abandoned his claims against Defendant Sevier County. (Doc. 73, at 1.) Accordingly, the Court **GRANTS** summary judgment in Sevier County's favor on Count II of the complaint against them. (Doc. 1, at 7–8.)

### II. FACTUAL BACKGROUND

In August 2017, Plaintiff Mark Nottage ("Nottage") was hired by Carolyn and Larry Carlson to perform construction work at their residence in Jefferson County, Tennessee. (Doc. 70, at 9; Doc. 74-1, at 4; Doc. 74-2, at 3, 24.) Nottage purchased cabinets on behalf of the Carlsons, some of which were Sienna in color and some of which were Storm Gray, and the Carlsons approved the transaction to their bank loan officer. (Doc. 70, at 29; Doc. 74-2, at 8–9, 18, 24; Doc. 74-3; Doc. 74-6, at 9–10; Doc. 74-7; Doc. 74-8; Doc. 74-9; Doc. 74-12, at 5.)

The record contains inconsistent facts regarding the color of the cabinets the Carlsons intended to order and the Carlsons' expectations surrounding delivery of the cabinets, but it is undisputed that on November 6, 2017, the Carlsons complained to the Sevier County Sherriff's Office that Nottage had not delivered cabinets that the they paid for, and had sold them to a third party instead. (Doc. 70, at 9–10; Doc. 74-4.) Defendant Ronald Coleman ("Coleman"), as an investigator for the Sevier County Sheriff's Office, was assigned to investigate the Carlsons' complaint. (Doc. 70, at 8; Doc. 74-4.)

Coleman interviewed the Carlsons, who told him that Nottage had ordered a set of cabinets using their money that they did not request. (Doc. 70, at 9–10.) Coleman learned during his investigation that Nottage had picked up and attempted to deliver the Storm Gray cabinets to the Carlsons, but that the Carlsons refused to take possession at that time due to incomplete construction in their home. (Doc. 74-2, at 12–13, 25–26; Doc. 74-6, at 18; Doc. 74-18, at 16.) The Carlsons later picked up the Sienna cabinets, which Coleman did not know during the course of his investigation. (Doc. 74-2, at 15–16; Doc. 74-6, at 22, 26; Doc. 74-18, at 26.)

Coleman then interviewed the third party that the Carlsons reported had bought the Storm Gray cabinets. (Doc. 70, at 13–15; Doc 74-2, at 27–28; Doc. 74-4.) Coleman did not visit the third party's home to view the cabinets. (Doc. 70, at 15.) Rather, he obtained a photograph from the third party of the cabinets installed in their home. (*Id.*) Coleman subsequently interviewed Josh Campbell, who sold Nottage the Sienna and Storm Gray cabinets. (*Id.* at 16–18.) Coleman showed Campbell the photograph he received from the third party. (*Id.*; Doc. 74-6 at 29.) Based on the photograph, Campbell told Coleman that the cabinets in the photograph looked like the Storm Gray cabinets Nottage purchased. (Doc. 70, at 17–18; Doc. 74-6 at 23–28.) Coleman

2

ultimately concluded that the Storm Gray cabinets purchased with the Carlsons' money had been installed in the third party's home. (Doc. 74-18, at 13, 21.) Coleman also interviewed the Carlson's bank loan officer, Marc Robertson, who issued the check for the purchase of the cabinets. (Doc. 70, at 19–20.)

Coleman did not attempt to interview Nottage during the course of his investigation. (Doc. 74-18, at 48.) Earlier in 2017, prior to the Carlsons filing their complaint with the Sevier County Sheriff's Department, Coleman attempted to contact Nottage regarding Nottage's alleged failure to pay rent to his former landlady. (Doc. 74-1, at 5; Doc. 74-18, at 37–40.) Nottage asked Coleman why he was calling about a civil matter and then hung up on him. (Doc. 74-1, at 5.) Coleman remembered this exchange after the Carlsons' complaint was referred to him for investigation; he considered Nottage's behavior on the call to be "rude" and did not contact him during the investigation because of "the attitude from [Nottage] before." (Doc. 74-18, at 45, 48).

Coleman sought a warrant for Nottage's arrest on December 1, 2017. (Doc. 74-5.) Coleman swore out that Nottage had picked up cabinets ordered using a cashier's check drawn on the Carlsons' account, but that Nottage had "never delivered the cabinets to the Carlson's [sic]." (*Id.*) The warrant was issued. (*Id.*)

Nottage filed his complaint on December 6, 2018, alleging violations of his Fourth and Fourteenth Amendment rights to be free from unreasonable seizure under 42 U.S.C. § 1983, as well as state-law tort claims for intentional infliction of emotional distress and false imprisonment. (Doc. 1.) Coleman has moved for summary judgment on Nottage's claims against him (Doc. 52), and his motion is now ripe for the Court's review.

### III. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

3

56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden to inform the court of the basis for its motion to identify the portions of the evidence in the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). At this stage, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, that party must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

When ruling on a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. et al. v. Zenith Radio Corp.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 248-49. "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

4

which that party will bear the burden of proof at trial.'" *Policastro*, 297 F.3d at 538 (quoting *Celotex*, 477 U.S. at 322). A "mere scintilla" of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## IV. ANALYSIS

To prevail on a § 1983 claim, "a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 358–59 (6th Cir. 2001) (citation omitted).

Qualified immunity "is a doctrine that 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020) (explaining that qualified immunity is appropriate unless a plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct" (cleaned up)).

In deciding whether a defendant is entitled to qualified immunity at the summary-judgment stage, the Court employs a two-part test, which may be conducted in either order. *Id.* (citing *Pearson*, 555 U.S. at 236). The Court must determine whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012). Also, if a constitutional right

5

was violated, the Court must determine whether the right was clearly established at the time the violation occurred. *Id.* The plaintiff bears the burden of "satisfy[ing] both inquiries in order to defeat the assertion of qualified immunity." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) ("Plaintiff must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation. . . . If Plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden.").

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Sixth Circuit has emphasized that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad proposition.'" *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* "The doctrine of qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Kent v. Oakland Cty.*, 810 F.3d 384, 395 (6th Cir. 2016) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)).

### A. Unlawful Seizure

It was clearly established prior to Nottage's arrest that an arrest without probable cause violates the Fourth and Fourteenth Amendments. *See Baker v. McCollan*, 443 U.S. 137, 142–43 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)) ("By virtue of its 'incorporation' into

the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty."); *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003) (citing *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)) ("Today it is well established that any arrest without probable cause violates the Fourth Amendment."). Therefore, whether Coleman is entitled to qualified immunity hinges on whether Coleman did, in fact, arrest Nottage without probable cause, thereby violating Nottage's clearly established constitutional rights.

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)). However, under § 1983, an officer "is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of . . . the information possessed at the time by the arresting agent." *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) (citing *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)). Therefore, "even if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." *Id.* (citing *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011)).

"A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Harris*, 513 F.3d at 511 (citing *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006)). "A probable cause determination . . . must take account of 'both the inculpatory

7

*and* exculpatory evidence' then within the knowledge of the arresting officer" at the time of the arrest. *Barton*, 949 F.3d at 951 (emphasis in original). An officer "cannot simply turn a blind eye toward potentially exculpatory evidence." *Id.* (citing *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007)). However, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Jones v. Clark Cty.*, 959 F.3d 748, 757 (6th Cir. 2020) (citing *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999)).

Viewing the facts most favorably to Nottage, the following is undisputed: Coleman knew that Nottage had picked up and attempted to deliver a set of Storm Gray cabinets to the Carlsons. Coleman later interviewed a third party, because the Carlsons believed Nottage had sold the third party the Storm Gray cabinets they paid for. Coleman obtained a photograph of the cabinets in the third party's home and subsequently interviewed Josh Campbell, who sold Nottage the Storm Gray cabinets purchased with the Carlsons' check. Based on the photo, Campbell identified the cabinets to Coleman as looking like the Storm Gray cabinets purchased by Nottage. Coleman ultimately concluded, albeit erroneously, that the Storm Gray cabinets paid for by the Carlsons had been installed in the third party's home and sought a warrant for Nottage's arrest.

Under these circumstances, at the time of the arrest, a reasonable officer could have believed that: 1) Nottage had not delivered Storm Gray cabinets to the Carlsons that had been purchased with their money, and 2) those cabinets were instead sold to and installed in someone else's home. This information was sufficient for a reasonable officer "to conclude that the arrestee has committed or is committing a crime," in this case the crime of theft. *Harris*, 513 F.3d at 503. Once probable cause existed to suspect Nottage for theft, no further investigation, exculpatory or otherwise, was required. *See Jones*, 959 F.3d at 757. Whatever animosity may or

8

may not have driven Coleman during his investigation is irrelevant when undisputed facts show that a reasonable officer could have believed, with the facts known to Coleman at the time the arrest warrant was sought, that he had probable cause to make the arrest.[1]

The Court acknowledges that Coleman certainly could not have ignored information that was known to him at the time he swore out Nottage's arrest warrant. However, the record does not reflect that any of the additional exculpatory facts raised by Nottage in briefing were actually known to Coleman at the time he sought Nottage's arrest.[2]

Nottage also raises a number of facts he believes Coleman should have investigated but ultimately failed to pursue or discover, including through interviewing Nottage himself. (Doc. 73, at 8–10.) Nottage further takes issue with a number of erroneous conclusions he asserts Coleman reached in the course of his investigation. (*Id.*) However, a conclusion drawn during an investigation that is incorrect in hindsight does not mean that an officer could not have reasonably believed he had probable cause to arrest someone based on that conclusion. *See*

---

[1] Sixth Circuit precedent makes clear that qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kent*, 810 F.3d at 395. Further, the test for qualified immunity "reflects an objective standard, making the official's subjective intent irrelevant." *Blake v. Wright*, 179 F.3d 1003, 1008 (6th Cir. 1999).

[2] Nottage argues that Coleman "intentionally chose to ignore materially-exculpatory evidence due to his desire to ensure Mr. Nottage was criminally prosecuted." (Doc. 73, at 4.) The Court reiterates that whether Coleman could bear liability under the law depends on whether an officer reasonably could have believed that Nottage's arrest was lawful in light of the information *known at the time of arrest*. *See Barton*, 949 F.3d at 950. Coleman's subjective intent is not determinative. *See Blake*, 179 F.3d at 1008. Nottage also raises a number of factual issues regarding the true color and amount of cabinets ordered at the direction of the Carlsons and asserts that Nottage still has the original Storm Gray cabinets he ordered for the Carlsons sitting in storage. (Doc. 73, at 2–3; Doc. 75, at 6–7.) Under these facts, a trier of fact in a criminal proceeding might determine that Nottage never intended to deprive the Carlsons of any property as to constitute theft under Tennessee law. However, Nottage's actual guilt or innocence does not direct the Court's determination on qualified immunity. *See Barton*, 949 F.3d at 950 ("[U]nder § 1983, an officer 'is entitled to qualified immunity if he or she could *reasonably (even if erroneously) have believed that the arrest was lawful*, in light of . . . the information possessed at the time by the arresting agent.'" (citation omitted) (emphasis added)).

*Klein*, 275 F.3d at 550 ("Probable cause is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and thus 'probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'" (citations omitted)).

Further, Nottage "enjoys no right, clearly established or otherwise, to 'a reasonable inquiry for inculpatory and exculpatory evidence.'" *Dodd v. Simmons*, 655 F. App'x 322, 327 (6th Cir. 2016) (citation omitted). Under Sixth Circuit precedent, Coleman was not obligated to speak to or otherwise interview Nottage if he had already developed sufficient probable cause for the arrest through other means. *See United States v. Harness*, 453 F.3d 752, 755 (6th Cir. 2006) (finding that a police officer need not speak to the suspect before arresting him because "once a police officer has sufficient probable cause to arrest, he need not investigate further") (quoting *Klein*, 275 F.3d at 551)).

Nottage also mentions Coleman's current beliefs about Plaintiff's guilt in his criminal case. (*See* Doc. 75, at 8–9.) However, Coleman's present opinions do not relate to the facts within his knowledge at the time of arrest, or how a reasonable officer would have interpreted them. The issue before this Court is not whether Nottage actually committed the crime of which he is accused. The circumstances that led to Nottage's arrest in this case could very well be grounded in a series of misunderstandings, and Nottage could later be found not guilty in a criminal court. However, the law of qualified immunity is not governed purely by hindsight or the subjective intent of the arresting officer. There is no dispute about the facts that were known to Coleman at the time of arrest, and based on those facts an officer could reasonably have believed that Nottage's arrest was lawful. Therefore, Coleman has qualified immunity and summary judgment will be **GRANTED** in his favor on Nottage's claim under § 1983.

### B. Supplemental Jurisdiction Over State-law Claims

When parties are non-diverse, as here, this Court may only hear state-law claims through the exercise of supplemental jurisdiction. 28 U.S.C. § 1367. District courts have the discretion to decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."). Because all federal claims will be dismissed by virtue of the Court's ruling on Defendants' motion for summary judgment, the Court will decline to exercise jurisdiction over Nottage's state-law tort claims.

Continuing to exercise supplemental jurisdiction should only be done "in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [ ] concern over needlessly deciding state law issues." *Id.* (citation and internal quotation marks omitted). When "all federal law claims are eliminated before trial, the balance of factors to be considered under pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The factors set forth in 28 U.S.C. § 1367 weigh against exercise of supplemental jurisdiction over Nottage's state-law tort claims. The Court finds that the interests of judicial economy and abstention from needlessly deciding state-law issues weigh in favor of declining to exercise supplemental jurisdiction over these claims. Accordingly, the Court will **DISMISS** Nottage's remaining state-law tort claims **WITHOUT PREJUDICE**.

## V. CONCLUSION

Defendants' motion (Doc. 52) is **GRANTED** with respect to Nottage's claims under § 1983. The remaining state-law tort claims are **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH
UNITED STATES DISTRICT JUDGE**